**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Orlando Carter, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:08-CR-51 |
| | ) | |
| vs. | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |

O R D E R

This matter is before the Court on Petitioner Orlando Carter's motion for reconsideration (Doc. No. 152), motion to vacate, set aside or correct sentence (Doc. No. 154) and motion for status concerning his motion for reconsideration (Doc. No. 159).  For the reasons that follow, Petitioner's motions for reconsideration and to vacate, set aside or correct sentence are not well-taken and are **DENIED.**  Petitioner's motion for status concerning his motion for reconsideration is **MOOT.**

I. Factual and Procedural Background

Petitioner Orlando Carter is a federal prisoner serving an aggregate term of 180 months of imprisonment following his convictions after a jury trial on each count of an eleven-count indictment charging him with mail fraud, conspiracy to commit mail fraud and wire fraud, bank fraud, conspiracy to commit bank fraud, making false statements to the Small Business Administration, bankruptcy fraud, and making false oaths in bankruptcy.

As described in a prior order of the Court , the government alleged and proved to

1

the jury's satisfaction that Carter devised and executed three separate schemes to

defraud:

> The first was a scheme to defraud Long Beach Mortgage Company by submitting or causing to be submitted a false residential mortgage application.  The second was a scheme to defraud Fifth Third Bank by submitting false financial statements to support a line of credit for Carter's business, Dynus Corporation.  The third was a scheme to commit bankruptcy fraud by concealing cash transfers to a bank account controlled by Carter's fiancee.

Doc. No. 150, at 1.

Generally speaking, however, the centerpiece of the government's case against

Carter involved his scheme to defraud Fifth Third Bank.  In turn, the principal but by no

means only way in which Carter defrauded Fifth Third was Carter's knowing

concealment of a loan guaranty from his company's external auditors, Clark Shaefer

Hackett ("CSH"):

> On December 31, 2004, Jim Smith, who was then president of Dynus, approached National City Bank with what essentially was a demand that it lend Butler County $4,000,000.  The supposed purpose of the loan was for Butler County to lease equipment from Dynus for the installation of a fiber optic network.  Smith was ostensibly authorized to borrow money on Butler County's behalf by the county auditor, Mary Kay Rogers.  In truth, however, Rogers had no authority to designate Smith, or anyone else for that matter, as an agent to enter into transactions on the county's behalf.  National City was leery of the transaction, but bowed to political pressure that Smith threatened to exert on the bank if it refused to make the loan.  National City, however, only agreed to extend the loan on the condition that within thirty days Dynus provide it with an opinion of counsel letter from Butler County stating that the transaction had been reviewed and that the county was authorized to enter into it.  If Dynus failed to provide the opinion of counsel letter within that time, it promised to repay the loan proceeds to National City.

> National City wired the loan proceeds to Dynus on December 31, 2004.  Dynus booked the proceeds as a revenue from the "sale" of the fiber optic network to Butler County despite the guarantee to repay the money if it could not produce an appropriate opinion of counsel letter.  The result was that Dynus's financial position was overstated by the amount of the loan proceeds.  Later in 2005, Carter, Smith and others at Dynus knowingly concealed the existence of the

2

guaranty from Dynus's external auditors.  Not having knowledge of the guaranty, the auditors approved Dynus's financial statements.  Then Dynus, with Carter's knowledge and approval, used the fraudulent financial statements to obtain money from Fifth Third Bank through a line of credit.  Carter, in turn, used the money Dynus received from Fifth Third to fund an extravagant personal lifestyle.

Dynus could not and did not provide the opinion of counsel letter National City required.  National City, therefore, demanded that Dynus repay the $4,000,000.  Butler County, meanwhile, had been completely unaware that Dynus had supposedly borrowed $4,000,000 on its behalf.  When, through an inadvertent computer error, the responsible officials in Butler County became aware of this transaction, they denied to National City that the fiber optic network project had been authorized and that the county was liable to repay the loan.

Doc. No. 150, at 2-3.

In addition to concealing the loan guaranty from the auditors, Carter also submitted or caused to be submitted false borrowing base reports to Fifth Third Bank to support the line of credit.  The borrowing base reports were false in that they reflected revenue or accounts receivables due on sales that had not actually been consummated.  For instance, the borrowing base reports falsely showed sales of fiber optic networks to West Chester Township, Ohio and the City of Greensboro, Alabama, and the sale of telephone equipment to Robins Air Force Base.

Carter's defense at trial was that he acted in good faith at all times and lacked intent to defraud in any of the schemes alleged by the government.  In particular, Carter claimed to have no knowledge of the loan guaranty, and consequently he did not knowingly conceal it from the auditors, which in turn meant that he did not knowingly submit false financial statements to Fifth Third Bank to obtain the line of credit.

As indicated, the jury convicted Carter on all eleven counts of the indictment and the Court sentenced him to an aggregate term of 180 months of imprisonment.  The Sixth Circuit Court of Appeals affirmed Carter's convictions and sentence on direct

3

appeal.  United States. v. Carter, 483 Fed. Appx. 70 (6th Cir. 2012) and the U.S. Supreme Court denied Carter's petition for a writ of certiorari in November 2012.  Carter v. United States, 133 S. Ct. 677 (2012).

In July 2013, Carter filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure based on alleged newly-discovered evidence. Specifically, the alleged newly-discovered evidence was a release of claims in subsequent civil litigation between National City Bank and Butler County over responsibility for repayment of the $4,000,000.  National City Bank released Butler County and other defendants "together with any officer, agent, or employee of any of them" from liability on the loan.  Carter's theory was that the since Mary Rogers purportedly made Dynus an agent of Butler County, the release cancelled the loan guaranty issued by Dynus, which in turn made Dynus's 2004 annual financial statement correct, which in turn meant that Carter did not submit false financial statements to Fifth Third Bank.  The Court, however, ruled that Carter's motion was untimely because it was not filed within three years of the jury's verdicts, but in any event the alleged newly-discovered evidence did not show that he would likely be acquitted on any of the charges after a new trial.  Doc. No. 150.  Carter then filed a motion for the Court to reconsider its decision denying his motion for a new trial.

On November 15, 2013, Carter filed a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.  Doc. No. 154.  Carter's motion raises four basic assignments of error, some of which contain numerous sub-assignments of error. First, Carter alleges that his trial counsel was ineffective in a number of ways, but in particular for failure to retain a forensic accountant to assist in trial preparation and

4

defense of the charges during trial. Second, Carter alleges that he was deprived of a fair trial because National City Bank failed to respond to a pretrial subpoena he issued. Third, Carter alleges that the government violated his rights under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), by not disclosing exculpatory evidence. Fourth, Carter alleges that the government violated his due process rights by knowingly presenting false testimony at trial.[1]

After principal briefing on Petitioner's motion to vacate, set aside or correct sentence was completed, the Court entered an order (Doc. No. 164) directing the government to file F.B.I. 302 statements of certain witnesses. The same order also directed Carter's trial counsel to file affidavits answering interrogatories propounded by the Court concerning the need to retain a forensic accountant to defend the case. Carter then filed his response to the 302 statements and to the affidavits filed by his trial counsel. Doc. No. 171.

Accordingly, Carter's motion to vacate, set aside or correct sentence is ripe for disposition. The Court's ruling on this motion effectively addresses and disposes of the arguments raised in Carter's motion for reconsideration. Accordingly, that motion is not well-taken and is **DENIED.** Consequently, Carter's motion for a status update on his motion for reconsideration is **MOOT.**

---

[1] Carter raises several other assignments of error for the first time in his reply brief that the Court will not consider. Bishop v. Oakstone Academy, 477 F. Supp.2d 876, 889 (S.D. Ohio 2007) ("[I]t is well established that a moving party may not raise new issues for the first time in its reply brief.") Specifically, Carter alleges for the first time that: 1) he was actually innocent of the bankruptcy fraud counts; 2) he did not direct Julie Light to create false and/or fictitious financial documents; and 3) that the government "chilled" a potential witness from testifying. These assignments of error are waived.

## II. Standard of Review

To warrant relief under 28 U.S.C. § 2255, a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict. Humphress v. United States, 398 F.3d 855, 858 (6th Cir. 2005). Relief is warranted only where a petitioner has shown "a fundamental defect which inherently results in a complete miscarriage of justice." Davis v. United States, 417 U.S. 333, 346 (1974).

Petitioner is entitled to an evidentiary hearing on his claims unless the record conclusively establishes that he is not entitled to relief. Smith v. United States, 348 F.3d 545, 550 (6th Cir. 2003). The Court concludes that the record conclusively establishes that Petitioner is not entitled to relief. Therefore, he is not entitled to an evidentiary hearing on any of his claims.

## III. Analysis

### A. Ineffective Assistance of Counsel

Carter alleges that his Sixth Amendment right to assistance of counsel was violated because his trial lawyers did not retain a forensic accountant to assist in preparing to defend the charges and to assist during trial. Carter claims in an affidavit he filed that he expressed the need to hire a forensic accountant to examine the company's financial information, particularly as it related to the National City Bank/Butler County transaction. Doc. No. 154-1. Carter claims further that counsel initially agreed that retaining a forensic accountant was "critical" but concluded later that an accountant would not be needed based on the evidence and testimony the government was expected to put on at trial. Id. Carter's trial counsel, on the other hand, indicate that

6

they did discuss with the Carter the need for a forensic accountant to defend the mail and wire fraud charges related to Long Beach Mortgage and in fact hired an accountant, Roy A. Mitchell, for that purpose.  Doc. Nos. 168-1, 168-2, 168-3.  Counsel aver further, however, that they did not employ an accountant to assist with the defense of the Butler County transaction because Carter was adamant that he was unaware of the guaranty that Jim Smith provided to National City Bank.  Id.  Counsel state that they did not consider whether the guaranty was valid because that position was inconsistent with Carter's contention that he did not know about the guaranty.  Doc. Nos. 168-1, 168-3.

To prevail on his ineffective assistance of counsel claim, Carter must establish two elements: 1) counsel's performance fell below an objective standard of reasonableness, and 2) there is a reasonable probability that, but for the deficiency, the outcome of the proceedings would have been different.  Strickland v. Washington, 466 U.S. 668, 694 (1984).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.  There is, however, "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  Defense counsel can be ineffective for not consulting or retaining an expert to assist with the defense of the petitioner's case, but the petitioner is still required to demonstrate that counsel's failure to retain or consult an expert resulted in prejudice.  Harrington v. Richter, 131 S. Ct. 770, 791-92 (2011).

In this case, Carter, through an accounting expert he retained for purposes of his § 2255 motion, posits a number of ways in which employing the services of a forensic accountant would have undermined the government's case.  The Court takes these sub-claims up seriatim.

7

1.  The Loan Guaranty

Carter and his expert argue that the loan guaranty Jim Smith gave to National City Bank was invalid and not enforceable.  They contend that Jim Smith was not authorized to bind Dynus with the guaranty, that the guaranty did not comply with the apparent authority requirements of Ohio law, and, in fact, that the guaranty referenced the incorrect Dynus entity.  According to their analysis, the fact that the guaranty was unenforceable means that Dynus's 2004 annual financial statement was actually correct and, therefore, that Carter did not defraud Fifth Third Bank by submitting it to obtain the line of credit.

Carter and his expert go further.  They argue that even if the guaranty was enforceable, and even had it been disclosed to the auditors, it would have been accounted for as contingent liability at year end.  According to Carter's expert, accounting for the guaranty as a contingent liability would not have negatively affected Dynus's financial picture.  Doc. No. 154-2, at 10.  Carter also claims that this evidence could have been used to impeach the credibility of Anthony Schweier, the partner at CSH in charge of Dynus's audit, and Vince Rinaldi, the executive who testified about the Butler County transaction from National City Bank's perspective.

The Court finds that Carter's trial counsel reasonably concluded that attacking the validity of the guaranty would not have been an appropriate defense strategy.  And, in any event, to the extent that Carter's trial counsel erred by not retaining a forensic accountant, the error did not result in prejudice to Carter because whether the guaranty was enforceable or not was not relevant to the defense of the fraud charges.

Carter wrongly presumes that establishing invalidity of the guaranty would have

8

erased his fraudulent intent.  It would not have, however, for several reasons.  The first and principal reason was accurately set forth by Carter's trial counsel  - any argument that the guaranty was invalid was inconsistent with Carter's assertion that he was completely unaware that Jim Smith had given the guaranty.  For the validity of the guaranty to have had any relevance, Carter would have to have taken contemporaneous actions consistent with a belief that the guaranty was invalid.

The government put on evidence of correspondence from National City Bank directed to Carter discussing the need to either provide the opinion of counsel letter or to return the loan proceeds.  Gov't Ex. 3.55.  The government also put on evidence that National City Bank executives had a face-to-face meeting with Carter in which the same demand was made.  See Doc. No. 95, at 95-97.  If Carter had had a legitimate belief that the guaranty was invalid because Jim Smith was not authorized to bind Dynus, then the jury would have expected to see evidence that Carter contested the validity of the guaranty at the time National City Bank demanded the return of the loan proceeds. Stated another way, if Carter actually had a legitimate basis on which to oppose National City Bank's demand, one would have expected him to assert it at the relevant time.  There was no such evidence, however, despite the fact that National City Bank made it very clear to Carter that it either wanted the opinion of counsel letter or the money back.  See id.  Carter, in fact, denied that National City Bank had presented a demand for return of the loan proceeds to him, so it would have been difficult if not impossible to reconcile with the jury a contention that the guaranty was invalid with a claim that National City Bank never made the demand.  Doc. No. 135, at 35-36.

Second, even if the guaranty was actually was invalid and did not bind Dynus,

9

Carter still has a problem with the fraud charges - the record indisputably showed that National City Bank would not have agreed to extend the loan (ostensibly to Butler County) and to wire the loan proceeds to Dynus without the guaranty.  If the guaranty was actually invalid, then National City Bank presumably still would have been entitled to the return of loan proceeds because the predicate to extending the loan failed.  Had Carter proved or attempted to prove that the guaranty was invalid, he would have then had to come up with an explanation to the jury as to why Dynus did not subsequently reverse the Butler County transaction, return the loan proceeds to National City Bank, amend its financial statements, then send the amended financial statements to Fifth Third Bank.  The jury likely would not have looked any more favorably on this line of defense than it did Carter's contention that he was unaware that the guaranty had been given to National City Bank.

In fact, proving or attempting to prove that the guaranty was invalid could actually have had the effect of reinforcing in the jury's mind what was already firmly demonstrated by the government at trial - that Carter also participated in defrauding both Butler County and National City Bank and that his involvement in using falsified documents to obtain loan proceeds from National City Bank was consistent with the charge that he used false or misleading documents to obtain money from Fifth Third Bank.  In that regard, then, claiming ignorance of the guaranty was better than claiming that the guaranty was invalid.

Even accepting Carter's proposition that the guaranty was correctly accounted for as a contingent liability that did not affect the year-end statement does not undermine the evidence of his intent to defraud.  Since the contingency requiring Dynus

to return the money to National City Bank occurred, (i.e., Dynus's inability to obtain the opinion of counsel letter by January 30, 2005) before CSH issued Dynus's financial statements in May 2005, presumably a footnote would have had to been added to the annual statement so that it was not misleading. See Doc. No. 131, at 56-58 (Schweier testified that financial statements will include "Subsequent Events" footnotes to make the reader aware of significant or material events that have occurred since the official year end).  In other words, one way or another, Carter would have had to disclose the existence of the guaranty to the auditors in order for Dynus's financial statements not to have been materially misleading.

Third, establishing the invalidity of the guaranty after the fact would not have negated Carter's intent to defraud at the relevant time.  See United States v. Daniel, 329 F.3d 480, 487-88 (6th Cir. 2003) (indicating that the time for ascertaining the defendant's intent to defraud is when the misrepresentation persuades the victim to undertake a substantial risk he otherwise would not have taken).

Fourth, and finally, the actual validity of the guaranty, and the correct accounting for it on the financial statements, i.e., whether it was actually a contingent liability, was not relevant.  As the Court explained in Daniel:

> The scheme to defraud element . . . is not defined according to a technical standard.  The standard is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.

329 F.3d at 486 (emphasis added)(internal brackets and quotation marks omitted).  The government put on nearly overwhelming evidence that Carter's dealings with Fifth Third Bank did not reflect "moral uprightness, fundamental honesty, fair play and right dealing

in the general and business life of members of society."

Jim Smith and Karin Verbruggen both testified that Carter knew about the guaranty and that National City Bank would be demanding the return of the funds if Dynus did not secure the opinion of counsel letter.  Doc. No. 79, at 22-23; Doc. No. 81, at 185.  In fact, Verbruggen told Carter in late January 2005 that "in about a week we're gonna have to give the money back if we don't get the opinion signed."  Id. at 28.  Carter told Verbruggen not to discuss the Butler County deal, the guaranty, or National City Bank's demand to return the loan proceeds with the auditors.  Id. at 40, 45.  Smith testified that he and Carter agreed to conceal the guaranty and National City Bank's demand from the auditors because of their belief that revealing this information would have negatively affected the audit.  Doc. No. 81, at 174-76; see also id. at 181-82 ("Q. Did you and the defendant intentionally deceive the auditors?  A. Yes.").

In other words, the evidence at trial showed that Carter knew about the guaranty, that Carter knew that National City Bank was demanding return of the loan proceeds, and that Carter acted in concert with Smith and Verbruggen to conceal this information from the auditors because it would have negatively affected the audit results.  He then knowingly submitted the fraudulent annual financial statement to obtain the line of credit for Dynus, as well as other loans, from Fifth Third Bank. Moreover, it should not be forgotten in the discussion of the guaranty the fraudulent borrowing base reports that Carter also submitted to Fifth Third Bank to support the line of credit.  Carter clearly did not deal with Fifth Third Bank in a honest and forthright manner.  The accounting and legal minutiae that Carter now raises about the guaranty do not undermine the fraudulent manner in which he obtained funds from Fifth Third Bank.  Moreover, a jury

12

composed of lay persons likely would not have been impressed by any attempt on his part to rely on technicalities to evade responsibility for the fraud he perpetrated on Fifth Third Bank.

In summary, there is not a reasonable probability that the trial would have been different had Carter's trial counsel retained a forensic accountant to challenge the validity of and proper accounting for the guaranty.

## 2. Failure to Investigate Audit

Carter next contends that counsel was ineffective for failing to employ a forensic accountant to investigate Dynus's 2004 annual audit. This assignment of error is mostly a re-hash of Carter's first assignment of error, i.e., the guaranty was invalid and Dynus's financial statements were actually correct. Carter also claims that CSH should have never issued an unqualified audit opinion because of a client-imposed restriction on the scope of the audit and that Anthony Schweier could have been impeached based on the firm's potential liability for wrongfully certifying Dynus's financial statements. Carter also claims that a forensic accountant could have corroborated his claim that he would not have bought a house he did not think he could afford by substantiating his financial position at the time.

This assignment of error is not well-taken for most of the reasons discussed in Part III.A.1. Carter's attempt now to shift the blame to CSH for allegedly wrongfully issuing an unqualified audit opinion would not have been a permissible trial strategy. According to this line of thinking, had CSH not issued an unqualified opinion, Fifth Third Bank would not have extended the line of credit and hence there would have been no offense. As the government cogently points out, Carter apparently thinks that his trial

13

counsel should have defended the case by blaming the auditors for not uncovering his fraud. Even if, however, CSH incorrectly issued an unqualified audit opinion, that fact does not negate Carter's intent to defraud. As already explained, the evidence at trial showed that Carter knowingly concealed material facts about Dynus's financial position from the auditors in order to get a clean audit report.

Finally, using a forensic accountant to attempt to corroborate Carter's claim that he would not have bought a house he did not think he could afford likely would not have changed the outcome of the charges related to Long Beach Mortgage. There was extensive evidence that Julie Light and Damian Ortiz, with Carter's knowledge and approval, created and submitted false financial documents, such as fake W-2's and fake pay stubs, to Long Beach Mortgage so that Carter could obtain a mortgage for his home. A forensic accountant would not have been useful to rebut that evidence. Additionally, the government presented evidence that Carter made wildly divergent representations about his annual income that a forensic accountant likely would not have been able to square up. See, e.g., compare Gov't Ex. 1.1. (Carter claimed monthly income of $35,000 to Long Beach Mortgage in his loan application on February 11, 2005) with Gov't Ex. 9.1(a) (reporting annual income of $111,700 to the Small Business Administration on February 28, 2005).

Carter has not shown in this assignment of error a reasonable probability that the result of the trial would have been different.

### 3. Cross-examination of Vince Rinaldi

This assignment of error is another variation on Carter's "the guaranty was invalid" theme. This time, Carter argues that defense counsel was ineffective for failing

14

to cross-examine National City Bank executive Vince Rinaldi about the validity of the guaranty. Cross-examining Rinaldi about the validity or invalidity of the guaranty would have been irrelevant for all of the reasons already discussed. This line of questioning would have been all the more irrelevant as to Rinaldi because National City Bank clearly believed that the guaranty was enforceable and had a good-faith basis for pressing Dynus to present the opinion of counsel letter or return the loan proceeds. And, again, had Rinaldi admitted that the guaranty was not enforceable, Dynus still would not have been entitled to keep the loan proceeds and Carter would have had to explain the failure to return the funds and correct Dynus's financial statements.

This would not have been a fruitful line of cross-examination and counsel was not ineffective for not pursuing it.

### 4. Failure to Investigate the Demand Letter

This assignment of error also relates to Carter's contention that the guaranty was invalid and is not well-taken for all of the reasons already discussed.

### 5. Failure to Raise Actual Innocence as a Defense

This assignment of error argues that a forensic accountant would have shown that Dynus's financial statements were correct and that, therefore, Carter did not submit false financial statements to the banks to obtain loans. Carter argues, therefore, that trial counsel should have raised actual innocence as a defense to the charges in the indictment.

Carter's contention that "actual innocence" is a defense to the charges in the indictment is a misnomer because, insofar as the Court is aware, the concept of "actual innocence" only applies to obtain consideration on the merits of an otherwise

15

procedurally defaulted constitutional claim in post-conviction relief proceedings. <u>Gibbs v. United States</u>, 655 F.3d 473, 477 (6th Cir. 2011) ("The 'actual innocence' doctrine derives from the Supreme Court's 'fundamental miscarriage of justice' exception to the procedural default rule."). In any event, trial counsel raised essentially the equivalent of an "actual innocence" defense by contending that Carter acted in good faith at all times. This was a complete defense to the charges because, as the Court instructed the jury, good faith is inconsistent with intent to defraud. Indeed, a good faith defense likely was the best defense because it was easier to convey to the jury and did not require getting bogged down in technical accounting details.

Counsel was not ineffective for not raising an "actual innocence" defense, nor is there a reasonable probability that the outcome of the trial would have been different had they argued "actual innocence" to the jury.

### 6. Ineffective Cross-Examination of Anthony Schweier

Carter next alleges that trial counsel's cross-examination of Anthony Schweier, the CSH partner in charge of Dynus's 2004 audit, was ineffective because it failed to delve into the validity of the guaranty and the accuracy of the audit.

The Court need not re-visit the question of the validity of the guaranty once again. As already explained, whether the guaranty was legally enforceable has no bearing on Carter's intent to defraud.

Carter also argues that counsel ineffectively cross-examined Schweier about Dynus's financial statements. This argument relates to an accounting entry noted as "billings in excess of costs" which Schweier testified was related to the Butler County contract but not the $4,000,000 loan from National City Bank. Carter contends that

16

Schweier's testimony gave the jury the impression that there were <u>two</u> $4,000,000 unrecorded obligations on Dynus's financial statements.  Carter contends that trial counsel was ineffective for not correcting this misapprehension.

The Court finds that Schweier's testimony was not misleading.  The Court first notes, however, that to the extent that Carter may be arguing that the government elicited misleading testimony from Schweier on this subject, his trial counsel first raised the issue of "billings in excess of costs" on cross-examination.  <u>See</u> Doc. No. 131, at 109.  Accordingly, trial counsel was not ineffective for not clarifying alleged misleading evidence put on by the government.

In any event, Schweier explained the concept of "billings in excess of costs" as it related to the Butler County contract and that it essentially represented unearned revenue - Dynus had received revenue from Butler County purportedly for the sale of the fiber optic network but had yet to perform any work on the project.  <u>See</u> <u>id.</u> at 109 ("Invoices had been sent in excess of costs and profits that had been earned."); <u>id.</u> at 136.  Schweier did testify that this entry was not related to the National City Bank loan, which was technically true because had the contract been legitimate, Dynus would have owed the work to Butler County, not National City Bank.  Schweier did testify that, had it been disclosed, the guaranty would have represented another $4,000,000 liability on the balance sheet.  <u>Id.</u>  This was correct also, although it seems probable that a clarifying footnote would have been added to financial statements in order to indicate that Dynus did not actually have $8,000,000 in total liabilities related to Butler County and National City Bank.  Of course part of the problem with attempting to convey accurate accounting concepts for these transactions is that they were all fraudulent -

17

there was no legitimate contract with Butler County and Carter and Jim Smith defrauded National City Bank to obtain the loan proceeds in the first place.  To the extent there was confusion about properly accounting for these transactions, the fault lies with Carter.

Importantly, however, no one, and certainly not the government, ever argued that Dynus's financial statements were overstated by $8,000,000.  Schweier in fact testified that the Butler County contract - not the National City Bank loan - represented all of Dynus's 2004 profits.  Id. at 29; 55.  There was no emphasis on the issue of "billings in excess of cost" during closing arguments and, consequently, to the extent that Schweier's testimony was misleading it is not reasonable to believe that it had any effect on the jury's verdicts - particularly in light of the other overwhelming evidence of fraud, such as the borrowing base reports.

### 7. Failure to Understand Accounting Terminology

Carter next contends that retaining a forensic accountant would have assisted counsel in correcting misleading testimony from the government concerning the correct accounting for the Butler County transaction and the National City Bank loan.  This assignment of error relates to Carter's contention that the government fostered a misimpression that Dynus had two undisclosed liabilities totaling $8,000,000.  This assignment of error is not well-taken for the reasons just discussed.

### 8. Failure to Interview the Government's Witnesses

Carter next alleges that his trial counsel was ineffective for not interviewing the government's witnesses before trial.  Carter contends that had counsel interviewed such witnesses as Schweier, Rinaldi, Verbruggen and Smith, the need to attack the validity of

18

the guaranty and its accounting effects would have become obvious.  Why this is so, Carter does not say.  Carter also claims that during opening statements, his counsel promised that Mary Kay Rogers, in alignment with Jim Smith and National City Bank, would try to scapegoat him for the Butler County deal.  He claims, however, that  had counsel interviewed Rogers before trial, they would have learned that Rogers was not aligned with Jim Smith and that this would have cast doubt on Smith's testimony. Rogers was not called by either side at trial; therefore, according to Carter, counsel failed to deliver on their promise to the jury to hear from Rogers.

The Court again sees no prejudice to Carter from this alleged failure.  The Court has already discussed ad nauseam the irrelevancy of the validity of the guaranty. Moreover, Carter has failed to explain how interviewing the witnesses he specifically mentioned would have highlighted the need to attack the validity of the guarantee or the proper accounting for it.  The Court has reviewed the F.B.I. 302 statements from these witnesses and nothing about them raises questions about the validity of the guaranty or the accounting for it.  This is particularly true because Smith and Verbruggen consistently indicated in the 302 statements that Carter knew about the guaranty and the potential that Dynus would have to return the money to National City Bank. Whether Rogers was aligned with National City Bank and Jim Smith or not is wholly irrelevant, but National City Bank and Smith both implicated Carter in the entire Butler County/National City Bank transaction.  From that standpoint, therefore, trial counsel's representation to the jury about what it could expect to happen at trial was accurate. Rogers' 302 statements provides almost no useful information.

Finally, the absence of Rogers from the trial could not possibly have bolstered

19

Jim Smith's credibility.  Smith was thoroughly impeached on many significant issues, such as his multitude of false statements, his forging of documents, and his desire to receive a lighter sentence in exchange for his cooperation with the government, nevertheless, the jury apparently found him credible.  The fact that Rogers, who herself was under indictment at the time, allegedly was not aligned with Smith in scapegoating Carter would not have been such a heavy counterweight as to alter the jury's assessment of Smith's credibility.

This assignment of error is without merit.

### 8. Failure to Impeach Anthony Schweier

Carter next argues that his trial counsel was ineffective for failing to impeach Anthony Schweier concerning a disbursement of approximately $360,000 from Dynus to him for a down payment on his house.  Schweier testified that CSH was unaware that this disbursement had been made whereas Julie Light testified that the auditors were aware of it because it was reflected on a balance sheet that the they had seen. Schweier testified that this disbursement would have been reflected on Dynus's financial statements had the auditors known of it because it was made in violation of the company's loan covenants with Fifth Third Bank.  Carter contends that trial counsel should have examined CSH's audit work papers to determine if CSH was in fact aware of the disbursement and then highlighted this discrepancy at trial to impeach both Schweier and Light.

Assuming that counsel made a professional error by not exploring this conflict in

testimony further with Schweier,[2] the error was harmless and does not create a reasonable probability that the result of the trial would have been different. Dynus's financial statements were already materially misleading as a result of the failure to disclose the guaranty to National City Bank. In light of the approximate $4,000,000 overstatement resulting from the guaranty, a credit in Carter's favor in the amount of $360,000 would likely not have convinced the jury that he did not submit a materially misleading annual financial statement to Fifth Third Bank. Additionally, whether CSH was actually aware of this disbursement has no bearing on the falsified borrowing base reports Petitioner also submitted to Fifth Third Bank. That evidence was substantial and not challenged by Carter in the present motion. Consequently, impeaching Schweier and/or Light with inconsistencies concerning whether this disbursement was disclosed to the auditors probably would not have changed the outcome of the trial.

B. Alleged Brady Violation

Carter's second and third assignments of error are related and concern the release of claims that PNC Bank (who succeeded National City Bank) issued to Butler

---

[2]     For instance, it would have taken an extraordinary amount of prescience of the part of Carter's trial counsel to anticipate that Light and Schweier would give conflicting testimony on this one point and then to subpoena CSH's work papers in order to exploit this discrepancy during the trial. It does not appear as a subject of questioning in either Light's or Schweier's 302 statements. The indictment has only a couple of brief references to this disbursement. Even then, however, one of those references relates to the mortgage fraud charge in Count 1 where it alleged that Carter falsely represented on his mortgage application that no part of his down payment had been borrowed. In other words, this reference has nothing to do with Dynus's financial statements. Indictment ¶ 5(d). The other reference to this disbursement - if indeed it is a reference to this particular disbursement - is even more vague. Indictment ¶ 30 ("[D]efendant **ORLANDO CARTER** used funds loaned to Dynus for unauthorized purposes and for his own personal benefit."). Nothing about these allegations should have reasonably alerted trial counsel of a need to review CSH's audit papers.

21

County in subsequent civil litigation over whether Butler County was liable on the $4,000,000 loan procured by Jim Smith.  As described above, the release, which was given in 2006, absolved Butler County "and its agents" for liability on the loan.  Carter contends that he tried to subpoena from PNC Bank all documents relevant to the Butler County transaction before the trial and that PNC Bank refused or failed to respond to his subpoena.  The government, in response to the present motion, conceded that the release was in its files but cannot confirm whether it disclosed the release to Carter pre-trial.  Carter contends that the release is exculpatory because it shows that there was no valid or binding agreement between Dynus and National City Bank and hence no contingency for Dynus to report on the financial statements that Carter submitted to Fifth Third Bank.

This release was not and is not material to Carter's case.  The Court plowed this ground fairly thoroughly in denying Carter's motion for a new trial.  To reiterate, however: 1) the release did not release Dynus from liability on the loan because Dynus was not an authorized agent of Butler County; and 2) under the Daniel case a release given by PNC Bank in 2006 could not negate Carter's intent to defraud in 2005.  Doc. No. 150 at 7-8.

This assignment of error is not well-taken.

## C. Presentation of False Testimony to the Jury

Carter's fourth and last assignment of error alleges that the government violated his right to due process by knowingly failing to correct false testimony that was presented to the jury.  The government did this, Carter contends, in two ways.  First, Carter contends that Vince Rinaldi and Ralph Martinez testified falsely that the guaranty

22

was valid when he has shown that it was not enforceable under Ohio law.  Second,

Carter contends that Anthony Schweier testified falsely about what adjustments would

have had to have been made to Dynus's financial statements had the guaranty been

disclosed when his expert has shown that no adjustments to the statements would have

been necessary.

This assignment of error rests of the incorrect assumption that the government

has knowingly presented false testimony just because government witnesses have

testified inconsistently on the same topic.  Showing a conflict in testimony on these

subjects, which is basically all Carter has done here (and even that assumes that Carter

can create a testimonial conflict after the fact with a witness who did not testify at trial),

does not show that the government put on false or perjured testimony.  United States v.

Scarborough, 43 F.3d 1021, 1026 (6th Cir. 1994) (noting that "mere inconsistencies in

testimony by government witnesses do not establish knowing use of false testimony") .

Indeed, any conflicts in testimony were properly for the jury to sort out.  Macon v. Davis,

450 Fed. Appx. 491, 492 (6th Cir. 2011).

This assignment of error is without merit.

Conclusion

**IT IS THEREFORE ORDERED THAT:**

1. Petitioner's motion to vacate, set aside or correct sentence **(**Doc. No. 154) and

motion for reconsideration (Doc. No. 152) are not well-taken and are **DENIED.**

Petitioner's motion for a status update on his motion for reconsideration (Doc. No. 159)

is **MOOT.**

23

2. A certificate of appealability will not issue with respect to this order because under the first prong of the applicable two-part standard established in Slack v. McDaniel, 529 U.S. 473 (2000), Petitioner has failed to make a substantial showing of the denial of a constitutional right because reasonable jurists could not debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further." Id. at 483-84.  Petitioner remains free to request issuance of the certificate of appealability from the Court of Appeals.  See 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b).

3. The Court certifies pursuant to 28 U.S.C.A. § 1915(a)(3) that an appeal of this order would not be taken in good faith, and therefore **DENIES** Petitioner leave to appeal in forma pauperis.  See Fed. R. App. P. 24(a); Kincade v. Sparkman, 117 F.3d 949, 952 (6th Cir. 1997).

Date August 13, 2014                    s/Sandra S. Beckwith
                                        Sandra S. Beckwith
                                        Senior United States District Judge